No objections to this Report and Recommendation (the "R&R") have been filed, and so I review it for clear error. Finding no error, clear or otherwise, I hereby adopt the R&R as the decision of the Court. Plaintiff's motion is granted; the Commissioner's cross-motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with the R&R. The Clerk shall terminate the pending motions, (Docs. 13 and 17), and remand and close the case.

Case 7:19-cv-09451-CS-JCM   Document 21   Filed 09/08/20   Page 1 of 40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

NANCY LEE,

                  Plaintiff,

      -against-

ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

------------------------------------------------------------X

SO ORDERED.

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.    9/8/20

**REPORT AND
RECOMMENDATION**

19 Civ. 9451 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Nancy Lee ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket No. 1).  Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 13); and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 17).[1]  For the reasons below, I respectfully recommend Plaintiff's motion be granted, the Commissioner's cross-motion be denied, and the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

---

[1] All citations to the parties' briefs refer to the page numbers assigned upon the electronic filing of the documents.

## I.  BACKGROUND

Plaintiff was born on August 13, 1973. (R.[2] 208).  On January 15, 2016, Plaintiff applied for SSI and DIB, alleging that she was disabled beginning June 1, 2010.[3] (*Id.*).  Plaintiff's application was initially denied on May 25, 2016, (R. 113), after which she requested a hearing, (R. 133).  A hearing was held on May 31, 2018 before Administrative Law Judge ("ALJ") Michael D. Burrichter ("ALJ Burrichter"). (R. 37-68).  ALJ Burrichter issued a decision on September 19, 2018 denying Plaintiff's claim. (R. 9-27).  Plaintiff requested review by the Appeals Council, which denied the request on August 16, 2019, (R. 1-4), making the ALJ's decision ripe for review.

### A.  Medical Evidence After the Disability Onset Date

Plaintiff received treatment during the relevant period from several physicians and medical personnel for her knees, right ankle and foot, back, and thyroid cancer, as well as for depression and anxiety.[4]

### 1.  John Carew, M.D.

On April 3, 2014, Plaintiff was diagnosed with papillary thyroid cancer. (R. 363).  On June 3, 2014, Dr. John Carew performed a thyroidectomy on Plaintiff to remove her thyroid gland. (R. 367-78).  Plaintiff was discharged on June 4, 2014, and Dr. Carew advised her to avoid lifting more than 10 pounds. (R. 379-81).  On September 11, 2014, Plaintiff received

---

[2] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on January 27, 2020. (Docket No. 12).  All page number citations to the certified administrative record refer to the page number assigned by the SSA.

[3] Plaintiff's attorney amended this date to January 29, 2014 at the beginning of the administrative hearing. (R. 44-45).

[4] Plaintiff also was treated for stomach cancer prior to the disability onset date, and there was no report of recurrence in medical notes during the relevant period. (R. 657, 665, 851-54).

ablation radiation therapy for her thyroid cancer. (R. 325-27, *repeated*, 520-22).  At a September 18, 2014 post-ablation appointment, imaging demonstrated that there were no new sites of abnormal radioiodine uptake. (R. 328, *repeated*, 523).

Dr. Carew also provided a general medical report for the purposes of Plaintiff's benefits application. (R. 329-38).[5]  Dr. Carew noted that Plaintiff could occasionally lift and carry up to 10 pounds, sit, stand, and walk for 4 hours during an eight-hour workday, did not require a cane to walk, would be able to use both feet to operate controls continuously, and would be capable of performing postural activities continuously, i.e., more than two-thirds of the time. (R. 330-33). With the exception of working at unprotected heights, Dr. Carew opined that she was largely tolerant of most environmental conditions, would be able to care for herself, walk without assistive devices, and navigate uneven surfaces without issue. (R. 334-35).  Dr. Carew also noted that any restrictions listed applied through July 2014, but that none would last for 12 consecutive months. (R. 335).

## 2.  Vincent Gramuglia, DPM

On February 25, 2015, Plaintiff saw Dr. Vincent Gramuglia, a podiatrist, for left-side plantar fasciitis. (R. 1800).  An examination revealed intact neurovascular status bilaterally, with some tightness in the left plantar fascia. (*Id.*).  Dr. Gramuglia diagnosed Plaintiff with plantar fasciitis with rheumatoid arthritis, and recommended that she perform stretching exercises. (*Id.*). At an April 8, 2015 follow-up appointment, Plaintiff indicated that she was "somewhat better," and Dr. Gramuglia recommended that Plaintiff continue performing stretching exercises. (R.

---

[5] The parties provide different dates for this report, with Plaintiff indicating that the report was dated June 18, 2017, (Docket No. 14 at 7), and the Commissioner indicating that it was completed in June 2014, (Docket 18 at 9).  The dates on the report itself are tough to read—nearly illegible—but appear to indicate that it was completed in 2014, not 2017. (R. 335, 338).  Nevertheless, whether it was completed in 2014 or 2017, the contents remain the same and it would not alter this Court's interpretation.

1801).  Plaintiff next saw Dr. Gramuglia on September 23, 2015, where he noted that an MRI of her right ankle revealed an osteochondral lesion on the talus. (R. 1802).  Plaintiff continued to have pain in her ankle with weightbearing and on inversion of the foot, leading Dr. Gramuglia to refer her to Dr. James McWilliam, a foot and ankle orthopedist. (*Id.*).  Dr. Gramuglia also gave Plaintiff a Controlled Ankle Movement ("CAM") walker to be worn until directed otherwise by Dr. McWilliam, and prescribed Ultracet and Percocet. (*Id.*).  Plaintiff saw Dr. Gramuglia again on November 2, 2016 complaining of bilateral mycotic nails, which were painful to palpitation, and contained periungual and subungual debris. (R. 1803).  Dr. Gramuglia performed a debridement on the nails, applied antifungal topical ointment, and indicated that Plaintiff should follow up as needed. (*Id.*).

Plaintiff saw Dr. Gramuglia for a follow-up appointment on July 8, 2017, complaining of right foot and lateral ankle pain. (R. 1804).  X-rays were unremarkable, and a physical examination revealed dorsalis pedis and posterior tibial pulses palpable on the right and left foot, intact reflexes and sensations bilaterally, but pain to stress and eversion on her right foot with localized edema and tenderness to palpitation. (*Id.*).  Plaintiff's strength and range of motion in her lower extremities were otherwise normal. (*Id.*).  Dr. Gramuglia diagnosed Plaintiff with right lateral OCD talus, right sinus tarsi syndrome, and right ankle synovitis, gave her a nerve block to relieve the pain on the right foot, as well as an ankle brace, and advised her not to wear flat shoes and to perform exercises for her Achilles and hamstrings. (*Id.*).

On March 19, 2018, Dr. Gramuglia performed a retrograde filling of the right talar osteochondral defect on Plaintiff's right foot. (R. 1519-1602, 1656-61).  During an April 25, 2018 follow-up, Dr. Gramuglia noted that Plaintiff was able to partially bear weight, (R. 1818), and at a May 12, 2018 visit, she had no swelling and a negative Tinel's sign, (R. 1816).  On May

12, 2018, Dr. Gramuglia also wrote a note to Plaintiff's physical therapist, indicating that Plaintiff's ankle should not be forced into excessive positions or ranges of motion, and that her care should focus on pain and swelling reduction, and palliative modalities, such as ultrasound, whirlpool, and electrical stimulation. (R. 1805).

### 3. Island Musculoskeletal Care

On January 29, 2015, Plaintiff had an initial evaluation with Dr. Robert L. Hecht at Island Musculoskeletal Care. (R. 639-40).  Plaintiff complained of pain in her back, left shoulder, and left knee, which she reported began after heavy lifting. (R. 639).  Plaintiff described her back pain as radiating down her right leg and the knee pain as intermittent. (*Id.*).  A physical examination revealed no tenderness in the lumbar spine, restricted range of motion in the shoulder, a negative straight leg raise test bilaterally, tenderness in the left knee with a restricted range of motion and a positive finding for crepitus, but otherwise revealed active range of motion and intact sensation in her lower extremities. (*Id.*).  An X-ray of Plaintiff's left shoulder, lumbar spine, and left knee showed some degeneration, but were unremarkable for fractures or dislocation. (R. 639, 641).  Dr. Hecht diagnosed Plaintiff with derangement of the left shoulder and left knee, lumbosacral sprain strain, and advised her to perform physical therapy and follow up in four weeks. (R. 637-38, 640).  From January 2015 until approximately March 2016, Plaintiff received physical therapy for her right ankle and foot. (R. 545-54, 557-58, 560-61, 610-13, 615-18, 621-24, 629-32, 634-35, 637-38).

Plaintiff next saw Dr. Hecht on March 19, 2015 for a follow-up visit. (R. 636).  In addition to her left shoulder, back, and left knee pain, Plaintiff now complained of pain in her right leg and foot, but denied any injuries. (*Id.*).  Plaintiff's physical examination was largely similar to the one conducted on January 29, 2015, and X-rays of Plaintiff's right ankle and tibia-fibula were unremarkable. (*Id.*).  In addition to his previous diagnoses, Dr. Hecht diagnosed

Plaintiff with derangement of the right ankle and foot and pain in the right leg, and advised her to continue with physical therapy. (*Id.*).

On March 25, 2015, Plaintiff saw Dr. Paul Kubiak for a follow-up appointment regarding her right ankle pain. (R. 633). Dr. Kubiak observed that Plaintiff walked with a limp on her right side, and a physical examination revealed "moderate generalized swelling" on Plaintiff's right ankle, along with pain and weakness with resisted motion, but no erythema, warmth, or signs of infection. (*Id.*). Plaintiff was also able to "actively plantar and dorsi flex the ankle as well as invert and evert with limited motion." (*Id.*). Dr. Kubiak diagnosed Plaintiff with right foot and ankle pain, ordered an MRI, and suggested that Plaintiff perform physical therapy and generalized stretching. (*Id.*).

Plaintiff saw Dr. Hecht on July 27, 2015 complaining of right calf pain, spasms and cramps. (R. 627). Dr. Hecht noted that Plaintiff walked with a cane and wore a brace on her ankle—which she indicated was "due to tendonitis not a weakness." (*Id.*). A physical examination revealed 2/4 reflexes in Plaintiff's patella and Achilles bilaterally, some tenderness to palpitation on her right calf, but no erythema, swelling, or lesions, with ankle strength greater than 4/5. (*Id.*). Plaintiff was also able to transfer on and off the examination table and from a chair independently. (*Id.*). Dr. Hecht diagnosed Plaintiff with right calf pain and spasms, with a history of ankle pain, as well as a sprain or strain of other specified sites of the knee and leg. (*Id.*). Dr. Hecht advised Plaintiff that before receiving any additional treatment, she should get a Doppler ultrasound to rule out deep vein thrombosis ("DVT"). (*Id.*). Plaintiff's Doppler was negative for DVT, and at an August 3, 2015 follow-up appointment, she informed Dr. Hecht that she wanted to begin physical therapy for her ankle and calf. (R. 625-26). Plaintiff's physical examination at the August 3, 2015 visit was largely similar to the July 27, 2015 visit, except she

had a negative Homan sign test, and Dr. Hecht noted that testing of her hips, knees, and ankles revealed no focal motor deficits. (R. 625). Dr. Hecht directed Plaintiff to follow up with Dr. Kubiak, get an MRI of her ankle, begin physical therapy, and see an orthopedist. (R. 626).

Plaintiff followed up with Dr. Kubiak on September 16, 2015, complaining of pain in her ankle and difficulty with weightbearing. (R. 619). Dr. Kubiak observed that Plaintiff was wearing a CAM boot, and he summarized her right ankle MRI, which showed an osteochondral injury of the medial talar dome with cartilage loss and bone marrow edema, as well as an attenuation of the anterior talofibular ligament. (*Id.*). Plaintiff's right ankle was tender to palpitation at the anterior tibiotalar articulation, and she experienced pain and weakness on resisted ankle inversion and eversion, but she was able to actively plantar and dorsiflex and had 2 posterior cells pedis pulse in the right foot with intact sensory and motor function of the foot distally. (*Id.*). Given Plaintiff's persistent pain and lack of response to treatment, Dr. Kubiak discussed other options with her, including surgery, and referred Plaintiff to an ankle specialist. (*Id.*).

Plaintiff saw Dr. Hecht again on January 26, 2016 for a follow-up visit complaining of persistent pain and limited range of motion in her right ankle and foot. (R. 614). Plaintiff had a ligament repair of her right ankle on December 14, 2015, which was performed by Dr. James McWilliam. (*Id.*). Plaintiff had mild swelling and restricted range of motion on her right ankle, and Dr. Hecht prescribed Plaintiff with physical therapy as per Dr. McWilliam's suggestion. (*Id.*). Plaintiff saw Dr. Hecht again on February 18, 2016, now complaining of chronic lower back pain—in addition to her persistent ankle pain—and requesting physical therapy for her back. (R. 562). Plaintiff had some tenderness in the lumbar spine and restricted range of motion, but no spasm, normal lordosis, and a negative straight leg raise bilaterally. (*Id.*). Plaintiff's right

ankle still had some tenderness, swelling, and restricted range of motion post-surgery, but she otherwise had full strength and range of motion in her other lower extremities. (*Id.*). An X-ray of Plaintiff's lumbar spine showed mild degenerative changes, (R. 559), and Dr. Hecht diagnosed Plaintiff with lumbosacral sprain-strain and prescribed additional physical therapy for her back. (R. 562-63).

Plaintiff saw Dr. Hecht on February 25, 2016, complaining of numbness in the right ankle and foot, with an associated "pins and needles sensation." (R. 555). Plaintiff continued to experience tenderness in her lumbar spine, with a restricted range of motion, as well as tenderness, swelling, and restricted range of motion of her right ankle and foot. (*Id.*). Plaintiff had full range of motion and motor strength in her other lower extremities, including her ankles. (*Id.*). An EMG test performed by Dr. Hecht suggested a right S1 radiculopathy, which was suggestive of a peripheral neuropathy of the right lower extremity, and Dr. Hecht advised Plaintiff to follow up with her primary care provider concerning this issue. (R. 556). Dr. Hecht also recommended an MRI of the lumbar spine given the radiculopathy finding. (*Id.*).

**4. James McWilliam, M.D.**

Plaintiff saw Dr. James McWilliam on October 15, 2015 for right ankle pain that she was still experiencing after a strain she suffered in March 2015. (R. 443). Dr. McWilliam observed that Plaintiff wore a walking boot and used a cane to ambulate, and she explained that despite having attended 10 physical therapy sessions, she was still in pain and having trouble walking. (*Id.*). After a physical examination, Dr. McWilliam diagnosed Plaintiff with an anterior ligament tear and osteochondritis dissecans ("OCD"). (*Id.*). Dr. McWilliam prescribed an additional 6 weeks of physical therapy and requested that Plaintiff bring a copy of her MRI results to the next visit. (*Id.*). Plaintiff next saw Dr. McWilliam on November 5, 2015. (R. 445). Plaintiff's MRI, but not her CT scan, showed OCD, and Dr. McWilliam observed that Plaintiff had right ankle

tenderness. (*Id.*).  Dr. McWilliam advised Plaintiff about possible arthroscopy, and surgery was scheduled. (*Id.*).

On December 11, 2015, Plaintiff saw Dr. McWilliam complaining of 10/10 right ankle pain, which she described as sharp and causing numbness in her toes. (R. 696, *repeated*, 711).  A physical examination revealed a positive anterior drawer, tenderness on the anteromedial and anterolateral ankle, but was otherwise normal. (*Id.*).  Dr. McWilliam diagnosed Plaintiff with a strain of an unspecified ligament of the right ankle, and indicated that they would prepare for surgery. (R. 697).  On December 14, 2015, Dr. McWilliam performed a right ankle arthroscopy, lateral ligament repair, debridement of OCD talus, applied bio-cartilage, and an iliac crest aspiration on Plaintiff without any complications. (R. 437-38, 451, 457-58).

Plaintiff saw Dr. McWilliam for a follow-up appointment on December 29, 2015. (R. 455, *repeated*, 709).  Plaintiff reported a 5/10 discomfort level, and presented with some associated swelling, as well as diminished motor functioning due to pain. (*Id.*).  Dr. McWilliam indicated that Plaintiff would be referred for physical therapy and should perform simple range of motion exercises for her ankle at home. (*Id.*).  Plaintiff saw Dr. McWilliam again on January 12, 2016, now complaining of intermittent 10/10 discomfort in her right ankle. (R. 543, *repeated*, 707).  Dr. McWilliam prescribed a functional brace, and referred Plaintiff to physical therapy for motor strength and balance, indicated that she should continue weight bearing as tolerated in a long CAM walker, and directed her to perform range of motion exercises for her ankle. (R. 454, 543, *repeated*, 707).  Plaintiff next saw Dr. McWilliam on February 23, 2016, reporting a 9/10 level of discomfort in her right ankle, which she characterized as constant and accompanied by swelling, weakness and numbness. (R. 541, *repeated*, 705). Dr. McWilliam indicated that

Plaintiff should continue with physical therapy and she would be sent for an electro-diagnostic study to assess the numbness in her foot. (*Id.*).

On March 6, 2016, Plaintiff saw Dr. McWilliam to review the EMG results. (R. 703). Plaintiff's discomfort level remained 9/10, and her symptoms continued without any relief. (*Id.*). Plaintiff's EMG results were consistent with lumbar radiculopathy and peripheral neuropathy, leading Dr. McWilliam to refer Plaintiff to a neurologist and order magnetic resonance imagining. (R. 704). Dr. McWilliam also indicated that Plaintiff should continue physical therapy and bracing exercises, and to follow up in six weeks. (*Id.*). Plaintiff saw Dr. McWilliam again on April 19, 2016, indicating that her foot/ankle discomfort was now 6-7/10, but she still experienced sharp pain while walking and standing—which was alleviated by resting and elevation. (R. 701). A general examination and X-ray revealed some mild tarsal bossing and degenerative changes at the 2nd and 3rd tarsometatarsal joint with associated tarsal bossing, a positive Tinel's in the deep peroneal nerve distribution, mild ankle swelling, a positive anterior drawer sign, but otherwise normal lower extremity functioning levels. (*Id.*). Dr. McWilliam remarked that Plaintiff was doing well with regard to her ligament repair and cartilage pain in her ankle, but that she did have some evidence of neuritis of the deep peroneal nerve with associated tenderness. (R. 701-02). Dr. McWilliam prescribed Plaintiff Naprosyn and noted that a neurologist would see her later in the month. (R. 702).

Plaintiff saw Dr. McWilliam for a follow-up visit on June 17, 2016. (R. 699). Plaintiff's ankle/foot discomfort was back to 10/10, and was similarly exacerbated by walking and standing. (*Id.*). Plaintiff's ankle presented with mild swelling, tenderness on the anterolateral and subfibular regions, but had full range of motion and stability. (*Id.*). Plaintiff had diminished sensation in the peroneal nerve, but otherwise normal functioning in her lower extremities. (*Id.*)

Dr. McWilliam administered a corticosteroid injection, and noted that Plaintiff informed him that she was unable to perform "even sedentary work," had been "disabled for over 12 months," and requested Oxycontin. (R. 700).  Dr. McWilliam indicated that she would be referred to a pain management provider, and to follow up with him after her next MRI. (*Id.*).

**5.  Montefiore Hospital**

On September 15, 2015, Plaintiff went to Montefiore Hospital complaining of right ankle pain. (R. 414).  Plaintiff explained that she had slipped and fell approximately one month earlier—and was performing weekly physical therapy—but the pain and swelling had worsened over the preceding two days. (R. 415).  An examination revealed overall normal functioning, including in the injured extremity, with no swelling, erythema, but mild tenderness. (*Id.*).  A sonogram showed no DVT, an X-ray revealed no fracture, an air cast was applied to Plaintiff's ankle and she was prescribed Naproxen. (R. 416-17, 420).

On August 29, 2016, Plaintiff saw Dr. John B. Pope because she was experiencing knee pain with weightbearing. (R. 728-30, 933).  Plaintiff described the pain as sharp and stabbing when weightbearing and as a dull ache at rest, and explained that it was somewhat alleviated by oral medications and rest, but not by injections, pain management, or physical therapy. (R. 728). Plaintiff's left knee examination revealed tenderness on the medial joint line and lateral patellar facet, her left foot was warm and well perfused, but was otherwise normal. (*Id.*). An X-ray of Plaintiff's knees revealed degenerative joint disease and patellofemoral joint arthritis with ossific loose body present in her left knee, and mild patellofemoral joint arthritis in her right knee. (R. 729).  Dr. Pope diagnosed Plaintiff with arthritis of the left knee, noted that Plaintiff's knee pain was interfering with occupational and recreational activities, and observed that she had "already maximized non-operative treatment" with little relief. (*Id.*).  Based on this assessment, Dr. Pope

concluded that Plaintiff would be a good candidate for a total knee replacement, and he discussed the benefits and risks with Plaintiff, who expressed interest in the procedure. (*Id.*).

Plaintiff saw Dr. Pope again on October 24, 2016 for a pre-operation examination and follow-up regarding her left knee. (R. 1167). Plaintiff continued to complain of pain, which interfered with her daily activities, and Dr. Pope's examination was largely similar to the one he completed on August 29, 2016. (R. 1167-68). On November 9, 2016, Dr. Pope performed a total left knee replacement on Plaintiff without complications. (R. 717-27). On November 10, 2016— while still at the hospital—Plaintiff received counseling regarding her discharge plan. (R. 1181-85). Plaintiff was subsequently discharged on November 13, 2016, was provided with discharge instructions, a list of medications and instructions detailing proper dosages, as well as a series of exercises to perform at home. (R. 1265-80).

Plaintiff, using a walker, appeared for a November 21, 2016 post-operation visit with Physician Assistant ("PA") James R. McGaughan. (R. 1335). Plaintiff was performing postoperative physical therapy, and reported that the pain she experienced prior to the operation was gone, but that she was still experiencing soreness and stiffness from the surgery. (*Id.*). Plaintiff's left knee had no effusion and a well-healed midline incision. (*Id.*). Plaintiff's range of motion was 0-105 degrees, her motor strength 5/5, sensation intact, and she was stable with varus and valgus stressing. (*Id.*). PA McGaughan encouraged Plaintiff to continue performing range of motion exercises and strengthening her knee, and ordered X-rays of her left knee. (*Id.*).

Plaintiff saw Dr. Pope on December 6, 2016 for a follow-up appointment. (R. 1341). Plaintiff was still using a walker and going to rehabilitation, and had no wound complaints, but did complain about swelling of her lower extremity. (*Id.*). Plaintiff's range of motion in her left knee had increased to 110 degrees, she continued to be stable and neurovascularly intact

throughout the wound, and an X-ray of her left knee revealed a well-aligned left total knee replacement. (*Id.*).  Dr. Pope noted that despite still having some issues walking up stairs and expressing a desire to continue physical therapy—which he approved—Plaintiff was "doing appropriately well" following her surgery. (R. 1342).

Plaintiff saw PA McGaughan on December 19, 2016, complaining of swelling in her knee and reporting that she was still going to physical therapy. (R. 1351).  The examination was largely similar to Plaintiff's December 6, 2016 visit, except her left knee range of motion increased to 130 degrees, and PA McGaughan prescribed Plaintiff wound gel. (*Id.*).  Plaintiff saw PA McGaughan again on January 30, 2017 for a follow-up visit. (R. 1359).  Plaintiff complained of pain and swelling, and had been using Dilaudid for the pain, which she received from her rehabilitation facility. (*Id.*).  Plaintiff's left knee had a well-healed incision, scarring, 5/5 motor strength, and stable varus and valgus stressing, but her range of motion decreased from 130 to 110 degrees. (*Id.*).  PA McGaughan indicated that Plaintiff should continue physical therapy, prescribed Plaintiff Percocet and gel for her scar, and indicated that if she runs out of pain medication, she should consult her own pain management physician. (R. 1359-61).

Plaintiff saw PA McGaughan again for a follow-up visit on March 28, 2017. (R. 1372). Plaintiff explained that she was still going to physical therapy, but her left knee pain persisted. (*Id.*).  PA McGaughan's examination was largely similar to prior visits, except Plaintiff's range of motion increased back to 130 degrees and she had some tenderness to palpitation on the posterior aspect of the kneecap as well as some pain in the lateral aspect of the knee. (*Id.*).  Based on Plaintiff's complaints of pain, PA McGaughan referred her to Dr. Gopal for a pain management evaluation, ordered a Doppler to rule out the possibility of a blood clot, and continued to prescribe physical therapy and gel for her scar. (*Id.*).

On April 14, 2017, Plaintiff, accompanied by her fiancé, saw Dr. Jonathan H. Lee for a visit regarding her persistent left knee pain, which she described as an ache that worsened with activity, and was alleviated with rest. (R. 1379).  Plaintiff was walking using a cane, and was able to put weight on both legs, but favored the right side—which had not been operated on. (R. 1382).  Plaintiff's straight leg test was negative bilaterally, her left knee range of motion was now 120 degrees, and she had some generalized tenderness to palpitation. (*Id.*).  Dr. Lee did not observe any gross instability, indicated that Plaintiff's left knee strength was 5/5, sensation was intact, and she had a negative Homan's sign test. (*Id.*).  Additionally, X-rays of the left knee showed no significant changes from prior imaging, and the Doppler ordered by PA McGaughan was negative for DVT. (R. 1379, 1382).  Dr. Lee instructed Plaintiff to continue physical therapy and pain management, prescribed a knee brace, instructed Plaintiff to continue taking Tylenol and Lyrica, and to follow up with Dr. Pope in a few weeks. (R. 1383).

Plaintiff saw PA McGaughan again on April 27, 2017 for a follow-up visit. (R. 1387).  Plaintiff was still experiencing localized pain in the lateral area of her left knee and continued to walk with a cane. (*Id.*).  A physical examination was largely similar to prior examinations, except her range of motion increased to 130 degrees—up from 120 at her April 14, 2017 visit with Dr. Lee—and she also had mild effusion. (*Id.*).  Plaintiff had seen Dr. Gopal for an examination, and he indicated that she should have her knee drained, which PA McGaughan attempted to perform during the April 27, 2017 visit. (R. 1387-88).  However, PA McGaughan was unable to aspirate any fluid, leading him to send her for a sedimentation rate to rule out an infection. (R. 1388).

### 6.  Farhad Elyaderani, M.D.

Plaintiff first saw Dr. Farhad Elyaderani on February 24, 2015 for an initial evaluation regarding her left knee pain. (R. 742-44, 1699-1701).  Plaintiff reported knee pain, which

worsened with activity and radiated down the back of her left leg, causing associated numbness and tingling in her toes. (R. 742).  Plaintiff's pain was somewhat alleviated by elevating her left leg; she had previously taken Hydrocodone and Meloxicam which were not helpful. (*Id.*). Plaintiff's motor skills were limited on her left leg due to pain, and otherwise full in the upper and lower extremities, but Plaintiff had decreased sensation on her left thumb and distal lower extremities. (R. 743).  Plaintiff's reflexes were +2 throughout, including her patellar tendon, Achilles, and plantar, with a negative Hoffman's sign test, and Plaintiff's coordination was normal, with an intact gait. (*Id.*).  Dr. Elyaderani diagnosed Plaintiff with neuralgia/neuritis, joint/leg pain, skin sensation disturbances, and lumbago, prescribed Gabapentin, and discussed referring her for physical therapy after seeing the results of her MRI. (R. 743-44).  Plaintiff saw Dr. Elyaderani on March 4, 2015 for an EMG and reflex studies, which were normal, revealing no evidence of peripheral mono or polyneuropathy, or neurogenic or myopathic changes or root dysfunction. (R. 745-49).

Plaintiff saw Dr. Elyaderani again on April 26, 2016 for a follow-up visit concerning her left knee pain and numbness in her right foot. (R. 750-52).  Plaintiff continued to complain of pain and weakness that worsened with physical activity, reporting that she was unable to use stairs, and experienced some relief by elevating her leg. (R. 750-51).  Plaintiff's motor skills were 5/5 proximally and distally in the upper and lower extremities, she had decreased sensation to the pinprick on her right foot, but her reflexes were +2 throughout, her coordination was normal, and gait intact. (R. 751).  A March 29, 2016 MRI revealed left side herniation at L1/L2, L2/L3, L4/L5, and a March 4, 2016 EMG showed R S1 radiculopathy. (R. 751-52).  Dr. Elyaderani diagnosed Plaintiff with low back pain, paresthesia of skin, lumbosacral root disorder, and unspecified neuralgia and neuritis, and prescribed Lyrica. (R. 752).

Plaintiff saw Dr. Elyaderani for a follow-up visit on May 24, 2016 complaining primarily of right foot pain, which she characterized as "severe and constant." (R. 753-54). Plaintiff's general examination was largely similar to her April 26, 2016 visit, and Dr. Elyaderani listed the same diagnoses, except he added bursitis, not otherwise classified on the right ankle and foot, and he increased her Lyrica dose. (R. 754-55). At an August 24, 2016 follow-up with Dr. Elyaderani, Plaintiff similarly complained of right foot pain and associated numbness, and Dr. Elyaderani's examination was largely similar to the previous visits. (R. 757-59). Dr. Elyaderani noted that Plaintiff had been prescribed Meloxicam and Tramadol, and discussed further diagnostic possibilities with Plaintiff. (R. 757, 760). Dr. Elyaderani also summarized an August 4, 2016 MRI of Plaintiff's right ankle, which demonstrated a worsening osteochondral injury of the medial talar dome and cartilage loss with cystic changes. (R. 759).

Plaintiff saw Dr. Elyaderani again on January 17, 2017, complaining primarily about 8/10 pain in her left knee following a total knee replacement. (R. 761-63). Plaintiff's motor functioning was 5/5 proximally and distally, she had a decreased pinprick to sensation on the right foot, her reflexes were 2+ throughout, and she had a negative Hoffman's sign test. (R. 762). In addition to low back pain, neuralgia and neuritis, and bursitis, Dr. Elyaderani diagnosed Plaintiff with left knee pain, increased her Lyrica dose, and indicated that she should continue physical therapy. (R. 763). Plaintiff saw Dr. Elyaderani for a follow-up visit on March 1, 2017. (R. 738-41). Since her last visit, Plaintiff's gait had improved and she was using a cane. (R. 739). Plaintiff's examination was largely similar to prior examinations, but Dr. Elyaderani increased her Lyrica dose based on her left knee pain, indicated that she should continue water therapy, and to follow up with her orthopedist. (R. 740-41).

**7. Nelson Tang, M.D.**

Plaintiff saw Dr. Nelson Tang on April 16, 2015 for pain management regarding mid-low back, left knee, and right ankle pain, which she described as chronic and worsening with physical activity. (R. 1812). An examination of Plaintiff's back revealed tenderness to palpitation of the thoracolumbar spine, with pain on rotation to both the right and left, and a positive facet-loading test. (*Id.*). Plaintiff's left knee had no valgus or varus laxity, her Drawer sign test was negative, her straight leg test was negative, but she had some tenderness in the infrapatellar regions and the McMurray's test caused Plaintiff pain. (*Id.*). Plaintiff's strength in her knee on flexion was 4+/5, and her spine strength was 4/5. (*Id.*). Plaintiff also experienced pain with the right ankle eversion stress test. (*Id.*). Dr. Tang diagnosed Plaintiff with thoracolumbar pain, left knee pain (arthritic component), and right ankle pain, increased her Gabapentin dose, and prescribed Pennsaid—a topical aid. (*Id.*). On May 9, 2018, Dr. Tang diagnosed Plaintiff with lumbar spondylosis and mild thoracic spondylosis. (R. 1811). Dr. Tang summarized Plaintiff's December 21, 2017 facet medial branch neurolytic procedure, where Plaintiff reported 80 percent pain reduction and improvement, along with the treatment she was receiving from her podiatrist, who was taking care of her right ankle. (*Id.*).

**8. Firas Barakat, M.D.**

Between February 2015 and March 2018, Plaintiff frequently saw Dr. Firas Barakat—her primary care physician—for appointments, check-ins, and for referrals to other providers. (R. 1702-03, 1706-10, 1715-18, 1721-26, 1738-55). On April 8, 2015, Dr. Barakat completed a "Care Required for Sick/Disabled Household Member" form. (R. 1707). Dr. Barakat indicated that Plaintiff required home health care—which was being provided by Everett Kevin, her fiancé—and had a long-term disability since June 2, 2014. (*Id.*). Dr. Barakat noted that Plaintiff would need assistance to ambulate outside of the house, bathe, and prepare meals, but would not

17

need assistance to walk inside of the house, get out of bed, rise from a seated position, use the toilet, dress, wash and feed herself. (*Id.*).  Dr. Barakat completed another "Care Required for Sick/Disabled Household Member" form on October 21, 2015, which was virtually identical to the April 8, 2015 form. (R. 1710).  However, the October 21, 2015 form included a second page, on which Dr. Barakat indicated that Plaintiff's conditions had not resolved or stabilized with treatment and that Plaintiff was unable to work for at least 12 months. (R. 1711).

On June 10, 2016, Dr. Barakat wrote a letter outlining Plaintiff's surgeries, specifically her stomach and thyroid, as well as her foot surgeries. (R. 682).  Dr. Barakat indicated in the letter that Plaintiff experienced foot pain, and opined that she was disabled and was unable to perform any type of work, including a "sit down or part time job," for at least one year. (*Id.*).  In June 2017 and March 2018, Dr. Barakat completed medical requests for home care for Plaintiff. (R. 1742-45, 1752-55).  On both forms, Dr. Barakat recommended that Plaintiff receive assistance with personal care and light housekeeping tasks, but noted that she was able to administer her own medication. (R. 1742-43, 1752-53).

### 9.  Martinez Fernandez, L.C.S.W.

Plaintiff saw Licensed Clinical Social Worker ("LCSW") Martinez Fernandez for individual therapy beginning on November 30, 2015 and continuing throughout 2016. (R. 669-75).  On February 22, 2016, LCSW Fernandez summarized Plaintiff's treatment and progress to date. (R. 674-75).  Among other areas for improvement, LCSW listed "coping w/ foot injury" as a problem in the "Medical/Physical Health" section, and listed anxiety and irritability in the "Mental Health/Emotional Health" section. (*Id.*).  LCSW Fernandez also provided a medical source statement, listing Plaintiff's treating diagnosis as post-traumatic stress disorder ("PTSD"), and also noting depression and anxiety as issues. (R. 676).  LCSW Fernandez wrote that

Plaintiff's concentration, ability to interact socially with the public in an employment setting, and adaptive abilities would all be limited. (R. 677-78).

**10. Mentwab Wuhib, Ph.D. – Consultative Examiner**

On May 5, 2016, Plaintiff saw Dr. Mentwab Wuhib for a consultative psychiatric evaluation. (R. 665-68). Plaintiff denied symptoms consistent with depression, but reported difficulty sleeping due to ankle pain. (R. 666). Plaintiff's mental status examination revealed normal functioning, with average intellect, but impaired recent and remote memory. (R. 666-67). Plaintiff reported that while she was able to bathe, dress, and groom herself, she showered using a chair because of her ankle problems, and was unable to stand for more than 10 minutes at a time. (R. 667). Plaintiff indicated that her boyfriend provided her assistance as needed with daily activities, she used Access-A-Ride for transportation, and her socialization was limited because of her medical problems. (*Id.*).

Dr. Wuhib diagnosed Plaintiff with other specified depressive disorder, in full remission, and provided the following medical source statement:

> The [Plaintiff] has no limitations to follow and understand simple directions and instructions. She has no limitations to perform simple tasks independently and does not need supervision. She has no limitations to maintain attention and concentration. She has no limitations to maintain a regular schedule, no limitations to learn new tasks, no limitations to perform complex tasks independently and does not need supervision. She has no limitations to make appropriate decisions, no limitations to relate adequately with others, and no limitations to appropriately deal with stress.

(R. 667-68).

**11. Cheryl Archbald, M.D. – Consultative Examiner**

Plaintiff saw Dr. Cheryl Archbald for a consultative examination on May 5, 2016. (R. 657). Plaintiff's chief complaints were: (1) deep peroneal neuritis associated with bruising of the

right ankle with a torn ligament and cartilage; (2) pinched nerve on the right side of her back; (3) osteoporosis in her back; (4) degenerative disc disease in the lower lumbar spine; (5) a hernia; (6) thyroid and stomach cancer. (*Id.*).  Plaintiff explained that she was unable to stand for more than 10 minutes because of pain, and received assistance with activities of daily living from her fiancé. (R. 658).  Plaintiff reported being able to prepare quick meals for herself, do some cleaning and "quick shopping," and showered and dressed using a chair to assist her. (*Id.*).

Although Plaintiff was able to get on and off the examination table without assistance, rise from a chair without difficulty, and squat 1/4 of a full range of motion, she used a cane to walk with a slow and guarded gait, leading Dr. Archbald to conclude that the cane appeared to be medically necessary. (R. 659).  Plaintiff's cervical spine showed full flexion, extension, and lateral flexion bilaterally, with full rotary movement, and her lumbar spine showed flexion of 45 degrees with back pain, full extension, with full rotary movement and lateral flexion on the left side, but 15 degrees on the right side with associated lower back pain. (R. 660).  Plaintiff's lower extremities revealed largely normal flexion and functioning, although she had some right posterior hip pain with flexion and extension. (*Id.*).  Plaintiff experienced right ankle pain with dorsi and plantar flexion, but Dr. Archbald observed no evident subluxations, contractures, ankylosis, or thickening, and her joints were stable, nontender, without effusion. (*Id.*).  Plaintiff's strength was 5/5 in both her upper and lower extremities, and Dr. Archbald observed no cyanosis, clubbing, or edema, and noted that Plaintiff's pulses were physiologic and equal. (*Id.*). Dr. Archbald also noted that an X-ray of Plaintiff's left knee revealed no significant bony abnormality, and she observed some straightening on an X-ray of Plaintiff's lumbosacral spine. (R. 660, 662-63).

Dr. Archbald concluded that Plaintiff's prognosis was fair, and provided the following medical source statement: "[t]he [Plaintiff] has mild limitations with walking, moderate limitations for squatting, marked limitations for bending, mild limitations for climbing stairs due to her right ankle pain." (R. 661).

## B.  Plaintiff's Testimony

Amy Shenstone, Esq. represented Plaintiff at the May 31, 2018 hearing. (R. 37).  Plaintiff testified that she had a high school degree and some college experience. (R. 49).  Plaintiff worked as a timekeeper for the City of New York from 2003 to 2007, at which point she became a payroll disbursement clerk. (R. 50).  As a timekeeper, Plaintiff testified that she dealt with the timesheets of 150 individuals and, "before the timesheets went computerized," had to lift the cases containing paper, which weighed approximately 15 to 50 pounds. (*Id.*).  As a disbursement clerk, Plaintiff assisted with the distribution of reports and paychecks, made visits to the Office of Payroll Management, and engaged in "some" heavy lifting, ranging anywhere from 5 to 50 pounds. (R. 50-51).  In 2009, Plaintiff had a break in service and took a seasonal job with the New York City Parks Department as a groundskeeper. (R. 51-52).  Plaintiff worked as a groundskeeper for four to five months and her duties—which were largely dependent on the season—consisted of shoveling snow and raking leaves, and required her to lift anywhere from 5 to 50 pounds. (R. 52).

Plaintiff testified that her stomach and thyroid cancers,[6] for which she had two organs removed, drain her energy levels and inhibit her ability to function on a daily basis, as does her left knee replacement—which she received in 2015—and the torn cartilage and ligament in her right ankle. (R. 52-53).  Plaintiff explained that in 2015, she had a "cyst … burning a hole in

---

[6] Plaintiff testified that both cancers were in remission. (R. 53-54).

[her] bones" for which she received retrograde filling. (R. 53).  Plaintiff indicated that she was still substantially limited and unable to "walk more than a block or two" or stand for "more than five minutes" before her ankle "swell[s] up like a grapefruit." (R. 53, 55).  To alleviate the swelling, Plaintiff testified that she tries to elevate her leg at heart level throughout the day. (R. 62).  Plaintiff testified that she experienced "so much pain" sitting in a chair, and likely could not sit still for more than 15 minutes without getting up to move around or elevate her leg. (R. 55). Plaintiff also testified that, throughout any given day, the maximum weight she could lift would be one gallon of milk. (*Id.*).  Plaintiff uses a cane for balance, which was prescribed by her doctor after her knee replacement. (R. 55-56).  Plaintiff testified that since her knee replacement and ankle surgery, she has been unable to walk or stand—with the exception of once or twice a month—without her cane. (R. 61-62).

Plaintiff lives in an apartment unit and is alone for a majority of the time. (R. 56-58). Plaintiff has a home health aide who assists her three days during the week from 9:00 a.m. to 2:00 p.m., and testified that her son and a friend visit "every once in a while." (R. 56-57). Although Plaintiff sweeps her apartment "once in a blue moon"—i.e. once during a given week—because of Plaintiff's ankle issues, her home health aide performs a majority of the chores at the apartment, including her laundry. (R. 58-59).  Plaintiff explained that she prepares herself simple meals, such as cereal, soup, instant noodle, and occasionally goes to the store for a quick trip one or two times a week when she is with her home health aide. (R. 59-60).  Plaintiff is unable to drive because of her ankle and instead uses public transportation—the bus—once or twice a week to go to physical therapy if someone is unable to pick her up. (R. 60-61).  However, if her ankle is giving her issues and she is unable to stand on it, she will forego taking the bus. (R. 61).

22

### C. Vocational Expert Testimony

Vocational Expert ("VE") Janice Hastert testified that she reviewed Plaintiff's file and was familiar with her vocational background. (R. 63-64). VE Hastert testified that Plaintiff's past relevant work consisted of the following jobs: (1) park maintenance worker, classified by the DOT as medium, unskilled work; (2) payroll clerk, classified by the DOT as sedentary, semi-skilled work; and (3) timekeeper, classified as sedentary, semi-skilled work. (R. 64). VE Hastert testified that Plaintiff performed all three jobs at a medium exertion level. (*Id.*).

The ALJ posed a hypothetical to VE Hastert, asking her to assume an individual of Plaintiff's age, education, and vocational history, with the following limitations: the individual can only perform sedentary work, lift and carry up to ten pounds occasionally, but less than ten pounds frequently, could stand or walk for two hours out of an eight-hour workday, while sitting for six hours out of an eight-hour workday, would require the use of an assistive device to walk, stand, and balance—but they would remain at the workstation, on task—and the opposite upper extremity could lift and carry up to the exertional limitation. This individual should also never climb ladders, ropes, and scaffolds, kneel, crouch, and crawl, but could occasionally climb ramps and stairs, as well as balance and stoop. The individual should never use foot controls bilaterally, although she could frequently reach overhead in all directions with the left upper extremity, but could never work at unprotected heights or with moving mechanical parts, and could occasionally work in vibration. (R. 65-66).

VE Hastert testified that such an individual could perform Plaintiff's past relevant work as a payroll clerk and timekeeper as generally performed, but not as described by Plaintiff. (R. 66). The VE also testified that this person could perform other jobs in the national economy, such as document preparer, eyeglass polisher and egg processor. (*Id.*). The ALJ next asked the

VE to assume the same limitations, except that the individual would be absent from work two

days each month. (*Id.*).  The VE testified that such a limitation would preclude all competitive

employment. (*Id.*).

**D.  The ALJ's Decision**

ALJ Burrichter applied the five-step procedure established by the Commissioner for

evaluating disability claims in his September 19, 2018 decision. *See* 20 C.F.R. §§ 404.1520(a)

and 416.920(a).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since January 29, 2014, the alleged onset date. (R. 15).  At step two, the ALJ found that

Plaintiff had the following severe impairments: (1) left knee degenerative joint disease status-

post arthroplasty; (2) right ankle/foot degenerative joint disease, tear, medial talar dome lesion

and lateral OCD talus/sinus tarsi syndrome status-post debridement and retrograde filing; (3)

plantar fasciitis on the left lower extremity; (4) degenerative disc disease of the lumbar spine; (5)

left shoulder degenerative joint disease; (6) neuralgia/neuritis; (7) rheumatoid arthritis; (8) a

history of papillary thyroid cancer status-post thyroidectomy/resection and radiation in

remission; and (9) gastric cancer status-post gastrectomy in remission. (*Id.*).  At step three, the

ALJ found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart

P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and

416.926). (R. 18).

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to

perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except:

> she can lift and carry up to ten pounds occasionally and lift or
> carry less than ten pounds frequently, stand and/or walk for two
> hours out of an eight-hour workday, and sit for six hours out of an
> eight-hour workday.  The [Plaintiff] would require the use of an

> assistive device for ambulation, standing and balance, but they
> would remain at the workstation on task and the opposite upper
> extremity could be used to lift and/or carry up to the exertional
> limitation.  The [Plaintiff] should never climb ladders, ropes and
> scaffolds, kneel, crouch and crawl; and can occasionally climb
> ramps and stairs, balance, and stoop.  The [Plaintiff] can never use
> foot controls bilaterally.  The [Plaintiff] can frequently reach
> overhead and in all other directions with the left upper extremity.
> The [Plaintiff] should never work at unprotected heights or with
> moving mechanical parts; and can occasionally work in vibration.

(R. 19).  In arriving at the RFC, the ALJ considered all of Plaintiff's symptoms, and their

consistency with the objective medical evidence and other evidence in the record. (*Id.*).  The ALJ

ultimately determined that while Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the

intensity, persistence and limiting effects of the[] symptoms are not entirely consistent with the

medical evidence and other evidence in the record." (R. 20).  The ALJ reviewed the opinion

evidence in the record, assigning: (1) partial weight to Dr. Archbald's opinion; (2) "little" and

"less" weight to Dr. Barakat's opinion; (3) little weight to opinions in the record setting forth

"temporary restrictions … assigned" following Plaintiff's surgical procedures; (4) little weight to

Dr. Carew's opinion; and (5) partial weight to Dr. Gramuglia's opinion. (R. 23-24).  The ALJ

also considered an opinion provided by Plaintiff's "case manager,"—a non-medical source—

which he assigned "some weight," but also noted that it "d[id] not outweigh the accumulated

medical evidence regarding the extent to which the [Plaintiff's] impairments limit [her]

functional abilities." (R. 24).

At step four, the ALJ determined that Plaintiff was able to perform her past relevant work

as a payroll clerk and timekeeper. (R. 24-25).  The ALJ alternatively found that Plaintiff was

able to perform other jobs that exist in the national economy, specifically: (1) document

preparer; (2) eye glass polisher; and (3) egg processor. (R. 25-26). Thus, the ALJ concluded that

Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. 27).

## II. DISCUSSION

Plaintiff argues that the decision should be reversed and remanded for further

administrative proceedings for three reasons: (1) the ALJ failed to properly evaluate Plaintiff's

subjective complaints; (2) the RFC determination was not based on substantial evidence; and (3)

the ALJ did not properly weigh the medical opinions and violated the treating physician rule.

(Docket No. 14). The Commissioner argues that the ALJ's decision should be affirmed because

it is supported by substantial evidence, and that the ALJ properly assessed Plaintiff's subjective

complaints. (Docket No. 18).

## A. Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C.

§ 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant

is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 416.920(a)(4)(i)-(v); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v)).

  The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

**B.  Standard of Review**

  When reviewing an appeal from a denial of SSI or disability benefits, the Court's review

is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. §

405(g).  The Court does not substitute its judgment for the agency's, "or determine *de novo*

whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the

disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the

decision of the administrative agency by simply deferring to the factual findings of the ALJ."

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109,

112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for

reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an

improper legal standard," remand to the Commissioner "for further development of the

evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  The ALJ's Evaluation of the Treating Physician Evidence

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.*  The ALJ must afford controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (citing *Burgess*, 537 F.3d at 128).  If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  These "nonexclusive '*Burgess* factors' [include]: '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95-96 (citing *Selian*, 708 F.3d at 418).  "[T]o override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing factors.

*Greek*, 802 F.3d at 375 (alteration in original) (quoting *Selian*, 708 F.3d at 418).  "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96.  If the ALJ does not "explicitly" consider these factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Id.*

Plaintiff argues that the ALJ erred by failing to provide good reasons for discrediting Dr. Barakat's opinions. (Docket No. 14 at 28-30).  The Commissioner argues that the ALJ properly discounted Dr. Barakat's opinions because they were conclusory and not supported by the medical record. (Docket No. 18 at 27-29).  Upon careful review of the record, the Court concludes that the ALJ failed to explicitly consider each of the *Burgess* factors in evaluating Dr. Barakat's opinions, thus committing a procedural error. *See Estrella*, 925 F.3d at 96.  Given this error, the Court must now be satisfied that the record demonstrates that the ALJ weighed Dr. Barakat's opinions to determine "how closely [they] align[ed] with the objective medical record evidence." *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019).  After conducting a "searching review of the record," the Court respectfully recommends concluding that the ALJ failed to properly assess and evaluate Dr. Barakat's opinions, and thus failed to apply the substance of the treating physician rule.

In determining the appropriate weight to assign Dr. Barakat's opinions, the ALJ wrote that Dr. Barakat's opinions were "vague and do not offer any specific function-by-function analysis of the [Plaintiff's] abilities and limitations and are therefore of little probative value." (R. 23).  In arriving at this conclusion, the ALJ was referencing the forms Dr. Barakat completed concerning Plaintiff's functioning, (R. 1707-11), as well as those recommending that Plaintiff receive home health care, (R. 1742-45, 1752-55).  Despite the limited nature of these forms, "the

ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear." *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012) (quoting *Ellet v. Comm'r of Soc. Sec.*, No. 1:06-CV-1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011)).  Although Dr. Barakat's assessments setting forth Plaintiff's functioning levels were brief, and arguably vague, (R. 1707-11), the appropriate solution was not to reject the opinions contained therein on that basis, but rather to recontact Dr. Barakat in an effort to have him clarify any ambiguities.  For example, instead of assigning Dr. Barakat's opinions little weight due to the absence of a function-by-function analysis, the ALJ very well could have recontacted him to obtain such information. *See Isernia v. Colvin*, No. 14-CV-2528 (JEB), 2015 WL 5567113, at *10 (E.D.N.Y. Sept. 22, 2015) (remanding where the ALJ characterized the treating physician's opinion as vague, and "specifically stated [that] he wished [the physician] had provided: a function-by-function assessment of plaintiff's various mental limitations.").

Thus, the ALJ's rejection of Dr. Barakat's opinions based on vagueness and incompleteness, and subsequent failure to clarify or fill this void, constitutes an error warranting remand. *See, e.g.*, *Ruiz v. Comm'r of Soc. Sec.*, 1:18-cv-09659 (SDA), 2020 WL 728814, at *11 (S.D.N.Y. Feb. 13, 2020) (remanding to further develop the record where the ALJ found the treating physician's opinion vague) (collecting cases); *Heidrich v. Berryhill*, 312 F. Supp. 3d 371, 374 (W.D.N.Y. 2018) (remanding and directing the ALJ to recontact the treating physician where the treating physician's opinion was ambiguous); *Isernia*, 2015 WL 5567113, at *10 (remanding where the treating physician's opinion was vague and unclear) (collecting cases); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014) (An ALJ must "seek additional evidence or clarification from [the] medical source when [a] report from [the] medical

source contains a conflict or ambiguity that must be resolved") (citation and internal quotation

marks omitted) (alterations in original); *see also Stokes*, 2012 WL 1067660, at *12 (directing

ALJ on remand to recontact the treating physician where the ALJ found the opinion unclear).

The ALJ also failed to provide "good reasons" for discounting Dr. Barakat's opinions.

*Aung Winn v. Colvin*, 541 F. App'x 67, 70 (2d Cir. 2013). "The Second Circuit 'has consistently

held that the failure to provide good reasons for not crediting the opinion of a claimant's treating

physician is a ground for remand.'" *Laracuente v. Colvin*, 212 F. Supp. 3d 451, 466 (S.D.N.Y.

2016) (quoting *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012)). Despite the

ALJ's conclusion that some record evidence supported Dr. Barakat's opinions, he nevertheless

rejected the opinions based on vagueness and incompleteness. (*Id.*). While the ALJ "remains

free to discount the views of a treating physician if it is inconsistent with substantial evidence …

it is reversible error for an ALJ to omit reasons for dismissing the views of a treating physician."

*Price v. Comm'r of Soc. Sec.*, 14-CV-9164 (JPO), 2016 WL 1271501, at *4 (S.D.N.Y. Mar. 31,

2016) (internal citations and quotations omitted). Here, the ALJ simply discounted Dr. Barakat's

opinions because they were vague and conclusory, while also acknowledging that "the medical

record does show [Plaintiff] has severe impairments that limit her functioning." (R. 23). It is

well established that "[t]he opinion of a treating physician on the nature or severity of a

claimant's impairments is binding if it is supported by medical evidence and not contradicted by

substantial evidence in the record" *Selian*, 708 F.3d at 418. Thus, the ALJ's failure to discuss

the record evidence that contradicted—or supported—Dr. Barakat's opinions, constitutes an

error that warrants remand. *See Aung*, 541 F. App'x at 70 ("[F]ailure to provide good reasons for

not crediting the opinion of a claimant's treating physician is a ground for remand") (citation and

internal quotation marks omitted); *Greek*, 802 F.3d at 376 ("Because the ALJ rested his rejection

31

of [the treating physician's] opinion on flawed reasoning and failed to provide any other reasons for rejecting the opinion, the ALJ erred.").

While the Commissioner argues that the "ALJ's decision reflects [that] Dr. Barakat's opinion was not supported by the overall record showing that Plaintiff had full strength in her lower extremities, and was full-weight bearing, and had a normal gait," the ALJ's stated rationale for assigning Dr. Barakat's opinions little weight includes none of these reasons. (*Compare* Docket No. 18 at 28 *with* R. 23).  Indeed, "[the Commissioner's] after-the-fact explanation as to why the ALJ rejected Dr. [Barakat's] opinion[s] cannot serve as a substitute for the ALJ's findings." *White v. Saul*, 414 F. Supp. 3d 377, 385 (W.D.N.Y. 2019) (collecting cases); *see also Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) (rejecting the Commissioner's argument that the reasons for discounting the treating physician's opinion could be "clearly glean[ed] from the decision and from the record" where neither the ALJ nor the Appeals Council provided such reasons) (summary order); *McAllister v. Colvin*, 205 F. Supp. 3d 314, 333 (E.D.N.Y. 2016) ("None of the points articulated by the Commissioner were identified by the ALJ as a basis for his refusal to give Dr. [Bakarat's] opinion[s] controlling weight … Such *post hoc* rationalizations are insufficient, as a matter of law, to bolster the ALJ's decision.").  Finally, even though the ALJ is not required to credit Dr. Barakat's determination that Plaintiff was disabled, (R. 23), the ALJ is "not exempt … from [his] obligation, under *Schaal* and § 404.1527(d)(2), to explain why [Dr. Barakat's] opinions are not being credited." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

Accordingly, the Court respectfully recommends finding that the ALJ failed to follow the treating physician rule with respect to Dr. Barakat's opinions, and that remand is appropriate to correct this error.  The Court further respectfully recommends finding that on remand "the ALJ

should give sufficient explanation for the weight assigned to [Dr. Barakat's]" opinions, and that "[t]hese reasons must be more than conclusory statements and generic references to the record as a whole." *Laracuente*, 212 F. Supp. 3d at 467 (internal citations omitted).

## D.  The ALJ's RFC Determination

Plaintiff argues that the RFC determination is not supported by substantial evidence because the ALJ failed to cite to any opinions consistent with the RFC, and neglected to consider the consistency of Dr. Barakat's or Dr. Archbald's opinions with the RFC. (Docket No. 14 at 27-28).  The Commissioner argues that the record evidence supports the RFC, and that Plaintiff's argument concerning the ALJ's treatment of Dr. Barakat's and Dr. Archbald's opinions is unavailing. (Docket No. 18 at 26-29).

"An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of [Plaintiff's] work-related capabilities." *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000).  Substantial evidence must support the ALJ's RFC determination, and the failure to point to medical evidence supporting the RFC determination is a ground for remand. *See Valerio v. Comm'r of Soc. Sec.*, No. 08-CV-4253 (CPS), 2009 WL 2424211, at *16 (E.D.N.Y. Aug. 6, 2009) ("Neither the ALJ nor the Appeals Council referred to medical evidence supporting its RFC determination that plaintiff could sit, stand, and walk for up to six hours per eight-hour day and occasionally lift and carry as much as 50 pounds . . . The ALJ seems to have arrived at this determination simply by rejecting [the treating physician's] medical opinion"); *see also Sobolewski v. Apfel,* 985 F. Supp. 300, 314 (E.D.N.Y. 1997) ("The record's virtual absence of medical evidence pertinent to the issue of plaintiff's RFC reflects the Commissioner's failure to develop the record, despite his obligation to develop a complete medical history.").  As discussed in the previous section, the

ALJ's failure to follow the treating physician rule with respect to Dr. Barakat's opinions provides an independent basis for remand.  However, in addition to this legal error—which, by the ALJ's own admission, created an evidentiary void in the record, (R. 23)—the ALJ also failed to support the RFC determination with substantial evidence.

A common thread in the ALJ's assessment of the opinion evidence, as well as some of the medical evidence, is that there were no function-by-function analyses to support the listed limitations. (R. 23-24).  For example, the ALJ only gave partial weight to Dr. Gramuglia's medical records, which the ALJ wrote, "show[ed] a severe right ankle impairment that imposes functional limitations," because Dr. Gramuglia's "statement is vague and does not provide information on the [Plaintiff's] functional abilities and limitations." (R. 24).  Similarly, the ALJ provided "little weight" to the "temporary restrictions [that] were assigned" following Plaintiff's ankle and knee surgeries because: (1) "they were meant to be temporary;" and (2) "most are vague, and do not provide specific functional limitations." (R. 23).  The ALJ also only assigned Dr. Archbald's opinion partial weight because the terms "mild," "moderate" and "marked" "are vague terms and not specific functional limitations." (*Id.*).  Based on this factor—the apparent dearth of information provided by Plaintiff's examining physicians concerning her functional abilities and limitations—the ALJ effectively discounted all of the listed medical opinions, leaving an evidentiary void in the record that necessitates remand. *See Nunez v. Berryhill*, 16 Civ. 5078 (HBP), 2017 WL 3495213, at *26 (S.D.N.Y. Aug. 11, 2017) (finding remand required where numerous opinions of doctors in the record did not fill the evidentiary gap and the RFC was not supported by sufficient evidence); *Suide v. Astrue*, 371 F. App'x 684, 689–90 (7th Cir. 2010) ("But it is not the ALJ's evaluation of [the doctors'] reports that requires a remand in this case.  Even assuming that [the doctors'] opinions did not deserve greater weight, it is the

evidentiary deficit left by the ALJ's rejection of [these] reports—not the decision itself—that is troubling.").

Moreover, left without a viable medical opinion setting forth Plaintiff's functional limitations and abilities, the RFC is largely supported by the ALJ's own interpretation of the medical records, including the MRIs and X-rays contained therein. (R. 21-24). Given the lack of any controlling medical opinion—or at least one that the ALJ did not largely discount—the ALJ has improperly filled this evidentiary void with his own medical judgment and interpretation of these records. *See, e.g., Citro v. Colvin*, 16-CV-6564 (BCM), 2018 WL 1582443, at *14 (S.D.N.Y. Mar. 28, 2018) ("To the extent that the ALJ himself believed that plaintiff's mild degenerative disc disease and retrolisthesis … could not have produced the pain symptoms that plaintiff consistently described, he improperly usurped the role of a medical expert by substitut[ing] his own expertise or view of the medical proof for the treating physician's opinion") (internal quotations omitted); *Merriman v. Comm'r of Soc. Sec.*, No. 14 Civ. 3510 (PGG)(HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sep. 17, 2015) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error") (internal quotations omitted) (collecting cases); *Quinto v. Berryhill*, 17-CV-00024 (JCH), 2017 WL 6017931, at *13 (D. Conn. Dec. 1, 2017) (collecting cases for the proposition that "courts have found that the ALJ erred by discounting the treatment source opinion as inconsistent with the treatment notes when doing so required the ALJ to interpret the medical data in the treatment notes himself"); *Gross v. Astrue*, No. 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014) (finding remand appropriate where, after discounting the opinion evidence, the ALJ proceeded to improperly reach his own

conclusions by interpreting the medical evidence) (collecting cases).  Similarly, the ALJ improperly substituted his own opinion when he determined that the X-rays, MRIs, and medical records do not support a finding that Plaintiff's pain and impairments were not severe enough to preclude sedentary work. (R. 20-22).  This error was further compounded by the ALJ's admitted failure to obtain any comprehensive functional analyses from, for example, Dr. Barakat, Dr. McWilliam, or Dr. Gramuglia, any one of which could have better reconciled Plaintiff's subjective complaints with the objective medical evidence. *See Wilson v. Colvin*, No. 13-CV-6286P, 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) (finding that the ALJ erred by assessing plaintiff's physical limitations "on the basis of bare medical findings" without the assistance of any opinions that "relat[ed] those diagnoses to specific residual functional capabilities") (quotations omitted).

Relatedly, the ALJ improperly usurped the role of Plaintiff's physicians when he assigned "little weight" to opinions rendered following Plaintiff's ankle and knee surgeries for the purposes of the RFC determination. (R. 23).  The ALJ described these post-surgical restrictions as "temporary" and "vague [because they] d[id] not provide specific functional limitations." (*Id.*).  While these opinions and medical records cited were, in fact, rendered immediately after Plaintiff's surgical procedures, the ALJ neglected to reconcile those findings with other treatment notes that might cast doubt upon the "temporary" nature of some of the enumerated restrictions. (R. 23).  For example, the ALJ cites to Dr. McWilliam's December 14, 2015 post ankle surgery discharge plan, which—as would be expected immediately following surgery—includes recommendations of "nonweightbearing" and then "weightbearing as tolerated" after two weeks. (R. 432, 435).  However, the ALJ failed to reconcile these "temporary" restrictions with Plaintiff's progress—or lack thereof—in 2016, where Dr.

McWilliam's medical notes evidence Plaintiff experiencing continued pain and discomfort while walking and standing. (R. 541, 543, 699-703).  Moreover, the ALJ failed to compare these "temporary" restrictions with Dr. Gramuglia's medical notes, notes from Plaintiff's treatment at Island Musculoskeletal Care, as well as Dr. Elyaderani's notes, all of which document—to some extent—Plaintiff's pain and discomfort, as well as the persistent nature of her limitations. (R. 555-56, 562, 750-59, 1804, 1816, 1818).  While the ALJ cited some of these notes earlier in the decision, (R. 21-22), he failed to explicitly reconcile them with his conclusion that the restrictions were "temporary" and otherwise vague. (*Compare* R. 21-22 *with* R. 23).  An ALJ, however, may not use certain aspects of the medical evidence while ignoring others that might support a finding of disability. *See, e.g., Annabi v. Berryhill*, 16-CV-9057 (BCM), 2018 WL 1609271, at *17 (S.D.N.Y. Mar. 30, 2018) ("Similarly, an ALJ may not selectively cite treating notes or diagnostic imaging that support his finding of disability while failing to address other contrary evidence") (collecting cases); *Molina v. Colvin*, No. 13 Civ. 4989 (AJP), 2014 WL 3445335, at *17 (S.D.N.Y. July 15, 2014) ("This inconsistent use of [the doctors'] opinion[s], without any explanation by [the ALJ], is insufficient to support his physical residual functional capacity assessment that [plaintiff] could perform light work") (collecting cases).

Accordingly, the Court respectfully recommends finding that the RFC determination was not supported by substantial evidence.

## E.  The ALJ's Credibility Determination

Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective complaints. (Docket No. 14 at 20-26).  The Commissioner responds that the ALJ's credibility determination is supported by substantial evidence. (Docket No. 18 at 29-30).  However, because the Court has respectfully recommended that the case be remanded based on the ALJ's failure to follow the treating physician rule or support his RFC determination with substantial evidence, the Court

respectfully recommends declining to address the credibility arguments. *See, e.g.*, *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 62 n.13 (E.D.N.Y. 2018) (declining to address plaintiff's credibility argument where the court found remand appropriate based on the ALJ's failure to provide "good reasons" for discounting the treating physicians' opinions, but directing the ALJ to reconsider plaintiff's testimony and credibility after properly applying the treating physician rule); *Oomen v. Berryhill*, No. 16-CV-3556 (JLC), 2017 WL 1386355, at *14 (S.D.N.Y. Apr. 17, 2017) (declining to reach arguments concerning plaintiff's credibility and the ALJ's RFC determination where the court found remand appropriate based on the ALJ's failure to follow the treating physician rule); *see also Norman v. Astrue*, 912 F. Supp. 2d 33, 86 (S.D.N.Y. 2012) (declining to reach substantial evidence challenge where the court already found remand appropriate based on a violation of the treating physician rule and a failure to develop the record).

The ALJ's treatment of Plaintiff's testimony is inextricably intertwined with his treatment of the medical evidence and opinions. (R. 20-23).  Thus, on remand, the Court respectfully recommends directing the ALJ to revisit his evaluation of Plaintiff's credibility and the veracity of her subjective complaints after properly evaluating the medical opinions and other medical evidence in the record. *See Morris v. Colvin*, No. 15-CV-5600 (JFB), 2016 WL 7235710, at *10 (E.D.N.Y. Dec. 14, 2016) (declining to address plaintiff's argument that the ALJ erred in evaluating his subjective complaints where the court found that the ALJ failed to apply the treating physician rule).  The Court also respectfully recommends directing the ALJ to reassess Plaintiff's subjective complaints in light of her statements to the consultative psychiatric examiner and LCSW Fernandez. (R. 666-68, 674-78).  Specifically, LCSW Fernandez listed "coping w/foot injury" as an area for improvement for Plaintiff, (R. 674-75), and Plaintiff

informed Dr. Wuhib during the consultative examination that she was unable to stand for more than 10 minutes, needed assistance with daily activities, and that her socialization was limited due to medical issues, (R. 667). These notes, which were not explicitly considered by the ALJ, corroborate—at least in part—Plaintiff's subjective complaints, and should be considered on remand.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend granting Plaintiff's motion for judgment on the pleadings, denying the Commissioner's cross-motion, and remanding this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned. Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude later appellate review of

any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   August 19, 2020
         White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge